# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

8/20/2024

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

TWO ELECTRONIC DEVICES CURRENTLY IN POSSESSION OF THE DEA IN SOUTHERN OHIO

)
)
)
)
)
)

Case No.   3:24-mj-539

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

### SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute /distribution of controlled substancest |
| 21 USC s. 846 | conspiracy |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jessica Suddeth*

*Applicant's signature*

Jessica Suddeth, DEA Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means)*.

Date:   August 20, 2024

City and state:   Dayton, OH

Caroline H. Gentry
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Jessica Suddeth, hereby duly sworn, declare and state:

## INTRODUCTION

1.      I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA").  I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878.  Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2.      I have been employed as a SA of the DEA since June 2022, and I am currently assigned to the DEA Dayton Resident Office (DRO).  In July 2022, I reported to DEA Basic Agent Training in Quantico, Virginia.  In November 2022, I completed the 17-week Basic Agent Training Academy at the DEA Justice Training Center in Quantico, Virginia.  While attending Basic Agent Training, I received instruction on topics including narcotics identification, surveillance techniques, methods of operation of narcotics traffickers, law, evidence handling, undercover operations, current trends/patterns involving the distribution of narcotics, as well as other areas of drug enforcement.  Prior to my employment with the DEA, I served as a Probation Officer in various counties in Ohio as well as the United States Probation Department from February 2012 to October 2021.

3.      During my career with the DEA, I have participated in controlled substance investigations involving cocaine, methamphetamine, and fentanyl.  I have conducted physical surveillance and monitored/reviewed recorded conversations of drug traffickers.  I have participated in Title III investigations by monitoring lines, supervising monitors, and conducting surveillance to substantiate the Title III interceptions.  During these interceptions, I have become familiar with coded terminology used by drug trafficking organizations to disguise their illegal

activities and the manner in which they conduct these illegal activities. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the activities of drug smugglers and drug trafficking distribution networks including the use of communication facilities such as the United States Post Office and FedEx to ship both narcotics and United States Currency associated with the narcotics trafficking activities. I have interviewed witnesses, subjects, and defendants involved in and/or arrested for drug violations, and have participated in several joint interagency federal and state investigations. Through my training and experience as well as discussions with other agents, I know the following concerning drug traffickers and their practices, including their use of cellular telephones to engage in drug trafficking activity.

## **PURPOSE OF AFFIDAVIT**

4.      I make this affidavit in support of an application for a search warrant for the following cellular device – namely:

a.      An Apple iPhone with a black case (hereinafter referred to as "Target Device 1"), which is more fully described in Attachment A; and

b.      An Apple iPhone in a blue case (hereinafter "Target Device 2"), which is more fully described in Attachment A;

hereinafter, "Target Devices"). The Target Devices are in the custody and control of the DEA in Beavercreek, Ohio. Based on my training and experience, I know that the Target Devices have been stored in a manner to preserve their contents in substantially the same state as when they first came into the possession of the DEA.

5.      As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in

relation to the following offenses exist and can be found inside the Target Device:

a. Possession with Intent to Distribute and Distribution of Controlled Substances, in violation of Title 21, United States Code, § 841(a)(1);

b. Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

6. A list of specific items to be seized from the Target Devices is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found on the Target Devices.

7. I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with the above-described drug trafficking offenses is located at the properties described above.

## PROBABLE CAUSE

8. Through a criminal investigation, the DEA has linked Germel HUGHES to a drug trafficking organization distributing controlled substances throughout southern Ohio and Kentucky. While executing federal search warrants as part of this investigation, DEA seized the Target Devices. For the reasons detailed below, I believe that the Target Devices likely contain evidence of this drug trafficking organization.

9. During early 2024, I reviewed HUGHES' criminal history and learned that he has multiple prior drug-related convictions in the state of Ohio including but not limited to: possession of cocaine (2004); possession of heroin (2006); trafficking in heroin (2009); and trafficking in heroin (10-unit to 50-unit doses/vicinity of school or juvenile) (2016). During 2020, HUGHES was convicted in the United States District Court for the Southern District of Ohio of possessing

3

with intent to distribute 40 grams or more of a mixture or substance containing a detectable amount of fentanyl.  Sentenced to 60 months of imprisonment on that federal case, HUGHES was released from the Bureau of Prisons during August 2022.  He currently remains on supervised release with this Court and also is pending trial on a federal indictment in the Eastern District of Kentucky.

10.     During January 2024, DEA linked HUGHES to the distribution of fentanyl to a person identified herein as CD-1.  During mid-January 2024, DEA performed surveillance at HUGHES' then residence, ███████████████████ area.  While there, law enforcement saw CD-1 arrive in a vehicle and walked towards the residence.  Then, CD-1 walked from the direction of the residence to their car and drove away.  DEA followed CD-1 from HUGHES' residence, and law enforcement ultimately performed a traffic stop on CD-1's vehicle.  (Notably, between the traffic stop and CD-1's departure from HUGHES' home, CD-1 did not make any other stops).  During the encounter with CD-1, law enforcement recovered bulk amounts of fentanyl from CD-1's vehicle.  Law enforcement Mirandized CD-1, and CD-1 agreed to speak with police.  During their conversation, CD-1 confirmed that the fentanyl came from HUGHES and that HUGHES had additional drugs currently in his possession.  CD-1 advised that CD-1 had purchased fentanyl from HUGHES on three or four previous occasions and that HUGHES generally kept drugs at HUGHES' home.  Law enforcement has been able to corroborate statements that CD-1 made and therefore believe CD-1 to be credible and reliable.  It should be noted that CD-1 does have a criminal history, including burglary, theft, and forgery.  Based on my training and experience (as well as CD-1's statements below), I know that drug traffickers frequently communicate with one another via cellular telephone – including by call or test message – to arrange transactions such as that described above.

11.     During 2024, law enforcement stopped in the Dayton, Ohio, area a person identified

herein as CD-2; CD-2 was in possession of bulk amounts of fentanyl. At that time, CD-2 advised law enforcement that CD-2 had planned to take the drugs to HUGHES for HUGHES to add cut to it to increase its potency. For reasons detailed more fully below, law enforcement has been able to corroborate information from CD-2 and therefore has concluded that CD-2 is credible.

12. On or about March 19, 2024, an investigator from the DEA spoke with a person identified herein as CS-1. CS-1 has provided information to law enforcement for over a year and that information has led to arrests as well as the seizure of drugs and other contraband. While CS-1 provided information for financial consideration and has a prior felony conviction, DEA deems CS-1 credible and reliable. CS-1 explained that HUGHES currently was trafficking kilogram quantities of fentanyl in the Dayton area. According to CS-1, HUGHES often held up to 30,000 fentanyl pills and multiple fentanyl brick or kilograms.

13. On or about March 20, 2024, DEA performed surveillance of HUGHES, including at his new residence of ██████████████████████ area (hereinafter "Target Residence 1"). During these observations, DEA saw HUGHES leave Target Residence 1, enter the driver's seat of a Buick LaCrosse, and then drive away. While following HUGHES in the Buick, DEA saw him meet with several known drug traffickers in the Dayton area.

14. During 2024, law enforcement again interviewed CD-2. CD-2 wished to speak with law enforcement for judicial consideration. Law enforcement was able to corroborate CD-2's information and considers him credible.

a. CD-2 advised that HUGHES frequently sold drugs from Summit Square Apartments in Dayton, Ohio – the location of ██████████████████████, Ohio (i.e., Target Residence 2). CD-2 stated that HUGHES' ████████████████, would arrange these apartments for him, often asking her female acquittances to use their homes temporarily for drug

5

trafficking activity. According to CD-2, HUGHES used the apartments for mixing fentanyl and pressing pills. CD-2 reported that HUGHES often mixed fentanyl for other drug traffickers, charging hundreds of dollars for this service. CD-2 indicated that HUGHES commonly moved apartments every 30 days to avoid detection by law enforcement.

   b.  CD-2 also spoke of an incident that caused HUGHES to have a dispute with another drug trafficker. Specifically, CD-2 advised that one of HUGHES' customers had been stopped by police earlier in the year and that the customer had told on HUGHES. Given the information that CD-2 relayed – including where the customer lived and the timing of the stop – I believe that CD-2 was referring to the incident involving CD-1.

   c.  CD-2 gave law enforcement consent to search CD-2's cellular telephone; CD-2 advised that the cellular telephone contained HUGHES' contact information. CD-2 explained that CD-2 communicated with HUGHES via cellular telephone to engage in drug activity. CD-2 also provided DEA with a new contact number for HUGHES that CD-2 had learned since CD-2's encounter with police.

   15.  On or about April 26, 2024, law enforcement performed surveillance at HUGHES' residence at Target Residence 1 and observed him using a 2012 Nissan Rogue, bearing Ohio license plate number ████ and vehicle identification number █████████ (hereinafter "the Subject Vehicle"). During these observations, DEA saw HUGHES come and go from Target Residence 1 several times while in the Subject Vehicle. On one occasion, HUGHES was in the passenger seat of the Subject Vehicle. On another time, HUGHES was driving the Subject Vehicle. Notably, HUGHES did not park the Subject Vehicle in front of his home but rather left it in the parking lot of a market a short walk from the residence. Based on my training and experience as well as my discussions with other agents, I know that individuals engaged in

illegal activity often attempt to physically distance their vehicles from their residence to prevent law enforcement from associating the two together.

16.    After observing HUGHES in the Subject Vehicle, DEA queried law enforcement databases concerning its registration information. The Subject Vehicle returned to ████████████ Law enforcement also reviewed law enforcement databases and learned that plate readers in the area captured the Subject Vehicle on an almost daily basis. In comparison, the Buick Lacrosse in which agents observed HUGHES during March 2024 has been captured on local plate readers only twice during April 2024. Based on this information, I believe that HUGHES stopped driving the Buick and used in its place as the Subject Vehicle.

17.    On or about April 30, 2024, DEA again performed surveillance at HUGHES' Target Residence 1. Once again, HUGHES arrived at Target Residence 1 driving the Subject Vehicle. He stopped outside the home, and his ████████████████, exited the Subject Vehicle. She briefly entered Target Residence 1 and returned to the Subject Vehicle. HUGHES then drove away in the Subject Vehicle.

18.    During May 2024, DEA lawfully obtained footage from a surveillance camera stationed on the exterior of the Summit Square Apartments near the entrance of Target Residence 2. From a review of footage on May 8, May 10, and May 13, DEA observed HUGHES leave the area of Target Residence 2 and approach vehicles that recently arrived in the lot of the Summit Square Apartments. HUGHES appeared to engage in hand-to-hand drug transactions before returning to Target Residence 2. Throughout those days, the surveillance also captured  short-term foot traffic coming and going from Target Residence 2 consistent with individuals visiting this location to purchase drugs. Based on my training and experience, I know that drug traffickers frequently use cellular telephones to arrange these transactions with their customers. Specifically,

via text or call, customers will ensure that their supplier is available to complete a sale and that they have product on hand.

19. On or about May 15, 2024, DEA conducted surveillance on HUGHES as he moved from Target Residence 1 and Target Residence 2 in the Subject Vehicle. This surveillance ultimately resulted in the seizure of controlled substances that HUGHES sold to other individuals from Target Residence 2.  In particular:

a. On that day, investigators observed HUGHES leave Target Residence 1, enter the Subject Vehicle, and drive directly to Target Residence 2 with no stops in between. Based on my training and experience, I know that drug traffickers frequently keep bulk amounts of drugs at their homes for safety reasons and will take with them to their trap house (i.e., where they sell drugs to customers) just enough supply for the days sales.  HUGHES' travel from Target Residence 1 to Target Residence 2 is consistent with that pattern.

b. As confirmed through electronic surveillance – including the surveillance camera at Summit Square Apartment – HUGHES arrived at the complex, parked the Subject Vehicle and hung at the entrance of Target Residence 2.  During the day, the surveillance camera captured HUGHES leave the steps in front of Target Residence 2, go to the Subject Vehicle, and walk to a car that recently arrived in the parking lot.  HUGHES reached into his pocket and handed the driver something through the window.  These actions are consistent with a hand-to-hand drug transaction.  As that vehicle departed the area, marked units attempted to stop it but were unable to do so.

c. Later that day, the surveillance cameras captured HUGHES exit Target Residence 2 and performed what appeared to be a second hand-to-hand transaction with a vehicle.  After completing the transaction, HUGHES briefly went into Target Residence 2 and

then returned to the front porch. (Based on my training and experience, I believe that HUGHES was taking the money from the drug transaction into Target Residence 2 for temporary safekeeping). The vehicle then left the area. Law enforcement followed the vehicle and conducted a traffic stop of it. During the encounter, a trained certified drug dog alerted to the presence of narcotics in the car. A search of the vehicle recovered bulk drugs that field tested for the presence of cocaine. Law enforcement interviewed three occupants of the car – two women and one man. One of the women indicated that they had received the drugs from an older black man who approached their car and passed the drugs through the car window. She indicated that the man was wearing black. (I note that the woman's description matched the events captured in the video footage referenced above). The man in the car indicated that the drugs belonged to him and that they contained cocaine, heroin, and fentanyl. In sum, I believe that HUGHES sold these individuals drugs that he had stored at Target Residence 2.

      d.     Moreover, based on my training and experience, I believe that HUGHES likely arranged these transactions by contacting his customers via cellular telephone.

      20.     On or about May 20, 2024, law enforcement met with CD-1 who agreed to provide information in an effort to reduce CD-1's judicial exposure. CD-1 confirmed that HUGHES served as a source of fentanyl supply to CD-1. CD-1 explained that CD-1 often would travel to HUGHES' then residence on Hudson, where HUGHES would supply CD-1 with bulk amounts of fentanyl. According to CD-1, HUGHES fronted the drugs to CD-1. Upon selling the fentanyl, CD-1 would return to HUGHES' home and deliver cash to HUGHES. These activities occurred during 2023 up to and including early 2024. CD-1 indicated that he/she communicated with HUGHES via cellular telephone to arrange the drug transaction. CD-1's statements confirm that HUGHES tends to use his personal residence as a base of operation where he stores bulk

amounts of controlled substances as well as drug proceeds.  Additionally, like CD-2, CD-1 used cellular telephones to communicate with HUGHES.  I therefore believe that cellular devices belonging to HUGHES will contain evidence of his drug trafficking activity – including the identity of customers as well as prices and amounts of drugs sold.

21.     On or about May 22, 2024, DEA executed federal search warrants at Target Residence 1 and Target Residence 2.  DEA recovered at Target Residence 1 multiple plastic baggies containing bulk amounts of suspected fentanyl pills as well as grams of a powdery substance that field tested as methamphetamine.  At the time of the execution of the search warrant at Target Residence 1, three minor children were present in the home.  At Target Residence 2, DEA discovered small amounts of suspected control substances as well as two firearms.  DEA conducted a post-Miranda interview of HUGHES.  HUGHES denied living at Target Residence 1 (despite DEA seeing him there repeatedly as well as his representations to the probation office that he lived there).  HUGHES claimed that the drugs in Target Residence 1 belonged to his girlfriend's sister who had been murdered just hours before the execution of the search warrant.

22.     Additionally, when agents stopped and detained HUGHES, they recovered from his person incident to arrest the Target Devices.  DEA called the number that CD-2 had provided as belonging to HUGHES, and one of the Target Devices rang.  Based on my training and experience, I know that drug traffickers often hold and use multiple telephones to conduct their illegal operations.  For instance, they may use one telephone to speak with street level customers and use the other device to communicate with their source of supply.

23.     Based on the foregoing as well as my training and experience, I also know that drug dealers frequently keep multiple cellular telephones; traffickers frequently use different

phones to communicate with addicts, their own drug dealer customers, and their sources of

supply, accounting for the Target Devices recovered from HUGHES' person.  I believe that the

Target Devices will contain evidence of HUGHES' drug trafficking activity.  From my training

and experience, I know that at, the retail level, traffickers often use cellular telephones to arrange

transactions with their user-customers, often directing the customer to locations where the

trafficker can meet them and perform a quick hand-to-hand exchange.  In addition to using texts

to arrange a single sale, it is common for traffickers to send text messages to the users informing

them of price or the availability of a new supply of drugs (sometimes in a mass text to several

people simultaneously).  Given law enforcement's observation of drug traffic at the Target

Residences, the Target Devices will hold evidence of drug trafficking activity.  Traffickers

commonly store the names and phone number of their user-customers, as well as those involved

in the drug trafficking with the trafficker (sometimes under alias or code names).   Because

cellular phones often have digital cameras built-in to the phone, it is common for traffickers to

take pictures of themselves, their associates, proceeds, and other evidence of drug trafficking.

Cellular phones can also store photographs sent to the phone electronically.  It is common for

traffickers to possess multiple phones because they may be transitioning from sales on a

particular phone to another phone as a law enforcement countermeasure, and because traffickers

may use one phone to talk to customers while using other phones to communicate with a supplier

or associate.   I also know that cellular telephones store and collect location information on them.

This location information will assist law enforcement identify places where █████ sold drugs

as well as the homes/stash houses of suppliers as well as customers.


## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other

removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25.     Based on my training, experience, and research, I know that the Target Devices have capabilities that allows them to serve as a wireless telephone and digital camera, along with further capabilities that allows them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on Target Devices because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.	Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.	A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.	The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.	Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28.	Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29.	Because this warrant seeks only permission to examine devices already in law

enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

30.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Devices described in Attachment A to seek the items described in Attachment B.

*Jessica Suddeth*
Jessica Suddeth
Special Agent
Drug Enforcement Administration

By telephone
Sworn and subscribed before me on this
 20th  day of August 2024.

Caroline H. Gentry
United States Magistrate Judge

17

# <u>ATTACHMENT A</u>

The Target Devices, which are in possession of the DEA in Beavercreek, Ohio, are more fully described as:

a.     An Apple iPhone with a black case seized from Germel Hughes (hereinafter referred to as "Target Device 1"); a picture of Target Device 1 is attached below:



b.      An Apple iPhone in a blue case seized from Germel Hughes (hereinafter "Target Device 2"); a picture of Target Device 2 is attached below:



**ATTACHMENT B**

**PROPERTY TO BE SEIZED**

**ATTACHMENT B**

*Property to be seized*

1.      All records the Target Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1) (distribution/possession with intent to distribute controlled substances) and 846 (conspiracy) involving Germel Hughes between in or around January 2024 through May 2024 including:

       a.      lists of customers and related identifying information;

       b.      types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

       c.      any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

       d.      any information recording Hughes' schedule or travel;

       e.      photographs, videos, or images of firearms, controlled substances, bulk cash, jewelry or items used to process controlled substances.

2.      Evidence of user attribution showing who used or owned the Target Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

       As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.